JUDGE SULLIVAN

# 18 CV 4654

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

**COMPLAINT**

| | |
|---|---|
| JOHN R. BORZILLERI, MD, <br> Plaintiff | ) <br> ) <br> ) <br> ) |
| v. | ) <br> ) |
| SHEPHERD KAPLAN KROCHUK, LLC, <br> Defendant | ) <br> ) <br> ) |

CIVIL ACTION NO.

**DEMAND FOR JURY TRIAL**

Plaintiff, John R. Borzilleri, MD (hereinafter "Dr. Borzilleri" or the "Plaintiff"), Pro Se, alleges as follows:

## NATURE OF CASE

1. At its center, this case pertains to Qui Tam and SEC/Dodd-Frank whistleblower retaliation. In this action, John R. Borzilleri, MD seeks damages, litigation costs, and potential attorney's fees against Defendant Shepherd Kaplan Krochuk, LLC ("SKK" or the "Defendant") for Defendant's retaliation, including retaliatory discharge of Dr. Borzilleri from his position of employment, pursuant to Federal and State False Claim Act ("FCA") and SEC/Dodd-Frank whistleblower statutes.

2. Furthermore, along with blatant whistleblower retaliation, the defendant committed a wide array of other legal offenses against the plaintiff, Dr. Borzilleri, including wrongful termination, breach of SEC fiduciary duty, breach of contract, unjust enrichment, failure to act in good faith, breach of loyalty and defamation.

3. After 15 years of exemplary employment, Dr. Borzilleri was given notice of termination by his employer, SKK, just days after the unsealing of his two Qui Tam cases in mid-April 2018. The plaintiff was also given notice of termination by SKK just days after he filed (and disclosed to his employer) an SEC Whistleblower complaint against the same Qui Tam defendants, alleging material violations of SEC financial disclosure requirements.

4. Civil Action No. 1:14-cv-00031-WES was filed by the plaintiff (Relator) in the US Federal District Court of Rhode Island in January 2014. A First Amended Complaint was filed in May 2014. Civil Action No. 1:14-cv-00031-WES was unsealed, by court order, on April 4, 2018, after the government made a non-intervention decision about a month prior.

5. Civil Action No. 1:15-cv-07881-JMF was filed by the plaintiff (Relator) in the Southern

District of New York in October 2015. Civil Action No. 1:15-cv-07881-JMF was publicly unsealed, by court order, on April 14, 2018, after the government made a non-intervention decision a month prior.

6. The evidence will show that Shepherd Kaplan Krochuk's ("SKK") quickly terminated Dr. Borzilleri's employment, right after the case unsealings, in order to dissociate the firm from Dr. Borzilleri's Qui Tam efforts. SKK's actions represent a severe violation of Federal and State Whistleblower retaliation statutes.

7. Furthermore, SKK terminated Dr. Borzilleri by serving him with a frivolous and libelous lawsuit on May 9, 2018 in the Superior Court of Massachusetts (Civil Docket No. 18-1418-BLS1), in an ongoing going attempt at retaliation and intimidation.

8. In the lawsuit, SKK claimed that Dr. Borzilleri's employment was terminated based upon vague and false allegations of "unauthorized trading activity", "distributing public statements in violation of plaintiff's policies and procedures" and "material breeches of the defendant's employment agreement."

9. Dr. Borzilleri filed an Answer, with Counterclaims, in the Massachusetts Superior Court on May 26, 2018.

10. The plaintiff was terminated with the SKK Massachusetts lawsuit, without due process and in violation of the General Partner agreement governing the plaintiff's former investment fund.

11. Following the lawsuit filing, the defendant attempted to coerce the plaintiff into signing a "Separation and Release Agreement" on terms that were highly favorable to the defendant, while causing severe and permanent financial harm to Dr. Borzilleri and his family.

12. SKK's illicit goal of said "Separation and Release Agreement" was for defendant to gain legal absolution from the Dr. Borzilleri regarding obvious violations of Federal and State

Whistleblower Retaliation Statutes, at minimal cost to the firm.

13. When Dr. Borzilleri refused to sign the "separation agreement", the defendant further escalated its intimidation and harassment of the defendant and his family.

14. The defendant then violated its SEC fiduciary obligations to the plaintiff, and other long-term investor clients of the firm, by forcibly liquidating, against their will, the Dr. Borzilleri's former healthcare investment fund. As a result, the plaintiff and other SKK clients have been unnecessarily exposed to investment losses and a large tax liability, causing further irreparable financial harm.

## JURISDICATION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, based on Plaintiff's claims asserted herein arise under Section 922 of the Dodd-Frank Act.

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims asserted herein arise under the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h).

## THE PARTIES

17. Shepherd Kaplan Krochuk, LLC ("SKK) is a Delaware limited liability company with a principal place of business located at 125 Summer Street, 22nd Floor, Boston, Massachusetts 02109. The three "Managing Members" of SKK are David Shepherd, David Kaplan and Timothy Krochuk.

18. John R. Borzilleri, MD is a natural person residing at 1815 Haywaters Road, Cutchogue, New York 11935.

## FACTUAL BACKGROUND

19. John R. Borzilleri, MD was a top-performing, 15-year employee of Shepherd Kaplan Krochuk, LLC (and a predecessor organization, GRT Capital Partners, LLC) when he was given notice of his non-recourse termination by SKK, just days after Dr. Borzilleri's two Qui Tam cases were unsealed in April 2018.

20. During his tenure at the firm, Dr. Borzilleri was a founding General Partner and the sole fund manager of GRT/SKK Healthcare, LP, a long/short investment fund focused on the healthcare equity markets.

21. Over the 15 years, Dr. Borzilleri's fund was consistently among the top-performing investment funds at the firm. Dr. Borzilleri had an impeccable track record of ethical and loyal behavior at the firm.

22. During his tenure, Dr. Borzilleri was not aware of a single violation of corporate policies and none was ever alleged of him by his employer prior to the filing of the Massachusetts lawsuit by SKK.

23. Indicative of his ethical and compliant employment, both GRT and SKK permitted Dr. Borzilleri to work remotely from New York, without incident, since 2006.

24. Based upon his 25+ years of medical and investment expertise, in late 2012, Dr. Borzilleri began an extensive proprietary investigation of the factors behind massive US brand drug price inflation. To Dr. Borzilleri's surprise, the investigation led to his filing two Federal Qui Tam actions, in January 2014 and October 2015, respectively.

25. Out of respect for his employer, and due to False Claim Act legal requirements, Dr. Borzilleri used a private Gmail account for all communications pertaining to the Whistleblower

cases.

26. As per the seal provisions of the False Claims Act, Dr. Borzilleri, as the Relator, was legally unable to disclose the existence of the Qui Tam cases or the government investigation to anyone, including his employer, prior to their unsealing in April 2018. Dr. Borzilleri complied with this Federal legal requirement.

27. However, in December 2015, without violating the seal provisions, Dr. Borzilleri disclosed the details of his extensive proprietary investigation of US drug prices to the senior partners of GRT Capital, LLC (the predecessor employer). The information was disclosed via a 20-page written report and a conference call with GRT staff, arranged by Dr. Borzilleri. All three of the partners of GRT Capital, Greg Fraser, Rudy Kluiber and Tim Krochuk, participated in the conference call, along with the majority of the firm's fund managers. Tim Krochuk is now a managing member of SKK Capital, LLC.

28. In December 2015, as GRT management was aware, the same information was also distributed widely to the major press, other investors and various other long-standing contacts of Dr. Borzilleri.

29. At the time, the firm was well aware that Dr. Borzilleri had already taken large short positions in stocks related to the investigation. GRT management, and its compliance department, expressed no concern, in word or writing, regarding these investment positions.

30. On or about April 4, 2018 and April 14, 2018, Dr. Borzilleri's two Qui Tam cases were unsealed after the US Department of Justice (DOJ) made a non-intervention decision about a month prior.

31. As soon as feasible, on April 9, 2018, Dr. Borzilleri made senior staff and management at SKK aware of the unsealing.

32. The next week, on April 17, 2018, Dr. Borzilleri forward, via his private Gmail account, already public information about the Qui Tam cases to SKK senior staff/management, as well as long-standing press, investor and other contacts.

33. The next day, April, 18, 2018, Dr. Borzilleri had a conference call with senior management and legal staff of SKK to discuss the Qui Tam matters. On the call, Dr. Borzilleri disclosed to SKK that he had also recently filed an SEC Whistleblower action against the Qui Tam defendants.

34. Just two days later, on the afternoon of April 20, 2018, Dr. Borzilleri was informed by phone, by senior partner, Tim Krochuk, that SKK sought to quickly terminate its relationship with him, either by transferring his investment fund to another location or closing it down.

35. Mr. Krochuk informed Dr. Borzilleri that SKK expected him to formulate a plan for his exit from the firm within several weeks.

36. Mr. Krochuk did not provide any specific rationale for SKK's termination decision.

37. Dr. Borzilleri knew obviously from the short time course and his minimal management interaction, that SKK sought to quickly dissociate from the whistleblower actions.

38. Over the next several weeks, SKK management's behavior became increasingly deceitful and harmful to Dr. Borzilleri and his family. SKK's clear focus was to protect itself from any potential legal exposure, with a complete disregard for Dr. Borzilleri and his family's livelihood.

39. SKK's actions made it impossible for Dr. Borzilleri to legitimately pursue a new partner for his fund, causing him severe and irreparable financial harm.

40. For instance, SKK adamantly refused to provide any information, in writing, to potential new partners for Dr. Borzilleri.

41. SKK also demanded that Dr. Borzilleri not communicate, in any form, with the investors

in his fund.

42. After realizing that SKK management was not operating in good faith, Dr. Borzilleri notified SKK management, on May 3, 2018, of their likely violations of wide-ranging whistleblower anti-retaliation statutes.

43. Dr. Borzilleri also began contemporaneously documented his phone interactions with SKK, due to management's adamant refusal to put any communications in writing.

44. The next day, on the afternoon of May 4, 2018, SKK held a final conference call with Dr. Borzilleri.

45. On the call, Tim Krochuk, made false accusations against Dr. Borzilleri, claiming he was being terminated for SEC "insider trading" violations. He said that the reason that SKK could not put any information in writing was because Dr. Borzilleri would get in "trouble", if they did so.

46. Mr. Krochuk further falsely stated that SKK's termination action was unrelated to the whistleblower cases.

47. Dr. Borzilleri immediately knew that these statements by Mr. Krochuk were false, deceitful and intended to intimidate him into leaving the firm.

48. As documented in an email soon after the conference call, Dr. Borzilleri requested that SKK put any potential SEC "insider trading" allegations, and other information, in writing. As had become the pattern, SKK did not reply to the email or comply with the request.

49. Dr. Borzilleri had no further communication with SKK until being terminated when served the Massachusetts (MA) lawsuit at his home on the afternoon of May 9, 2018.

50. In the complaint, SKK made allegations, for the first and only time, that Dr. Borzilleri had been terminated for violations of "SKK policies and procedures" and an "Employment Agreement".

51. Soon thereafter on the same afternoon, SKK, remotely from Boston, deleted Dr. Borzilleri's company email system from his personally-owned computer at his home, including access to archived SKK documents and SKK email communications (including the emails from recent weeks regarding this matter).

52. About an hour or two later, Tim Krochuk sent an email to Dr. Borzilleri (to his Gmail account), with an attached proposed "Separation and Release Agreement".

53. In the email, Mr. Krochuk "offered to bring our complaint to a timely close", if Dr. Borzilleri would sign the agreement. The proposed agreement is attached as **Exhibit 1** to this document.

54. In the agreement, SKK offered Dr. Borzilleri $30,000 of severance and six months of healthcare coverage for his 15 years of top-performing employment.

55. In return, the agreement demanded that Dr. Borzilleri release SKK from any and all potential legal claims.

56. The agreement would only be valid if Dr. Borzilleri signed it on or before May 14, 2018.

57. Dr. Borzilleri quickly realized that the frivolous MA lawsuit by SKK was an escalation in its efforts to: a) intimidate him into exiting the firm quickly, on very unfair financial terms, and b) to protect the firm from clear violations of whistleblower retaliation statutes.

58. The next morning, May 10, 2018, Dr. Borzilleri sent an email to Tim Krochuk, acknowledging receipt of the lawsuit and committing to reply by the May 14th deadline. Dr. Borzilleri requested access to a few personal files that had been removed from his computer. He also requested that SKK inform the investors in his fund of his termination, due to mutual fiduciary duties. Both requests were ignored by Tim Krochuk and other SKK legal staff.

59. On the afternoon of May 14, 2008, Dr. Borzilleri sent an email to Tim Krochuk declining

the SKK separation agreement. He also requested that SKK forward a copy of the SKK "policies and procedures" and the "Employment Agreement" mentioned in the lawsuit. He once again requested access to some lost personal computer files.

60. Dr. Borzilleri also requested that his healthcare fund not be liquidated because it would cause severe financial harm to him, and other investors, due to capital gains and a resulting large tax liability. SKK ignored these requests.

61. Just a couple hours later, on the afternoon of May 14, 2018, SKK apparently sent a short email to the investors in the fund, informing them, for the first time, that Dr. Borzilleri had been terminated.

62. SKK informed the investors that the fund would be liquidated, with cash returned at a later date. SKK did not offer any other options to clients.

63. Despite being the largest investor in the fund, Dr. Borzilleri did not receive the client email notification until the next day.

64. Over the next several days, Dr. Borzilleri had a series of email communications with Tim Krochuk and the SKK legal staff highlighting their mutual fiduciary obligations to the long-term investors in the fund.

65. As a SEC-registered investment advisor, SKK has the fiduciary responsibility to act in clients' best interest at all times.

66. Dr. Borzilleri repeatedly informed SKK that liquidation was only one of the viable options for the fund.

67. The General Partner and/or the Offering documents for the fund allowed Dr. Borzilleri to take the fund to another location or for SKK to transfer the assets to investors either in cash or as in-kind securities.

68. Dr. Borzilleri repeatedly informed SKK that it had an SEC fiduciary obligation to inform the investors of these options and to inform them of the significant tax implications of liquidation.

69. When several close family/friend investors in the fund contacted the plaintiff, due to his fiduciary duty, Dr. Borzilleri informed them of the legitimate fund options and the tax issues.

70. Several fund investors sent emails to SKK requesting clarity, expressing concerns about tax exposure and asking the firm to consider other options besides liquidation.

71. Dr. Borzilleri, as the largest investor client in the fund, also repeatedly stated his request that SKK transfer his personal assets in-kind, so as to avoid a massive approximate $300,000 2018 tax bill resulting from a liquidation. All of these requests were ignored by Tim Krochuk and the legal staff at SKK.

72. As a result of SKK's clear violations of its fiduciary duties to SKK clients, including himself, on May 17, 2018, Dr. Borzilleri filed a complaint with the Securities and Exchange Commission (SEC) regarding SKK's breach of fiduciary duty.

73. Soon after the SEC filing, on May 17, 2008, Dr. Borzilleri forwarded the text comments of the SEC complaint to SKK management via email, along with confirmation of receipt from the SEC.

74. SKK did not reply to the email. The text of the SEC complaint is attached as **Exhibit 2**.

75. On May 21, 2018, SKK sent an email to healthcare fund clients, informing them that the fund liquidation would be complete by the "end of the week" and the firm expected to forward proceeds to investors by the end of June 2018.

76. Via the forced fund liquidation, SKK ignored its SEC fiduciary obligation to Dr. Borzilleri, and other firm clients, through its escalating personal retaliation against Dr. Borzilleri.

## SKK'S SEVERE AND PERMANENT HARM TO DR. BORZILLERI

77. SKK has caused severe and permanent harm to Dr. Borzilleri in a variety of ways.

**Gross Violations of Dr. Borzilleri's Federal and State Whistleblower Rights**

78. SKK has grossly violated Dr. Borzilleri's rights as a Qui Tam and SEC Whistleblower, under both Federal and State law. Dr. Borzilleri was given notice of the firm's non-negotiable termination on April 20, 2018, only a few days after the unsealing of the Qui Tam cases and only two days after a single conference call with the majority of senior management and legal staff.

79. Dr. Borzilleri was then officially terminated on May 9, 2018, upon being served a frivolous lawsuit, the intent of which was clearly to intimidate him into signing an unfair separation agreement providing the firm absolution from Whistleblower retaliation legal exposure.

80. Furthermore, SKK showed a remarkable lack of professionalism and judgement, by notifying Dr. Borzilleri of his termination after apparently minimal due diligence of the 4+ year complex Qui Tam matter.

81. After the quick notice of termination, SKK's only concern was its own legal exposure, with a wanton disregard for the financial well-being of a long-term loyal employee and his family.

**Severe and Permanent Financial Harm to Dr. Borzilleri and his Family**

82. After 15 years of exemplary employment, without cause, SKK forcibly ended Dr. Borzilleri's investment fund, and likely his career, in just a matter of weeks.

83. At nearly 60 years of age, the likelihood of Dr. Borzilleri finding a similar position in the investment world is practically nil, especially given the nature of SKK's termination.

84. SKK also ended Dr. Borzilleri's employment and fund when he had the greatest financial opportunity of his career, based upon his 5+ year proprietary investigation of severe US brand drug pricing.

85. Furthermore, by forcibly liquidating his equity holding in his fund, SKK has also maliciously and unnecessarily exposed Dr. Borzilleri, and other SKK clients, to investment losses and a large current tax liability.

86. Via liquidation, SKK has also prevented any financial returns for Dr. Borzilleri from his personal stock holdings, his primary source of income over his past 10 years of employment at the firm.

87. Due to the frivolous allegations of termination for "cause", Dr. Borzilleri is not eligible to file for unemployment benefits due to pending Massachusetts litigation.

88. SKK has further defamed Dr. Borzilleri, and his prior exemplary reputation, by attempting to use a public lawsuit to disparage and intimidate him into signing an egregious "Separation and Release Agreement".

89. The primary purpose of the lawsuit was to force Dr. Borzilleri to "release" SKK from any potential legal liabilities.

90. When these efforts failed, SKK further escalated its intimidation tactics by preventing Dr. Borzilleri from accessing his personal funds for family living expenses. Dr. Borzilleri had virtually all of his liquid assets in the fund when SKK closed the fund.

91. Finally, SKK violated its SEC-required fiduciary duty to Dr. Borzilleri, and other long-term firm clients, by forcibly liquidating his investment fund.

92. This unnecessary action was taken with malicious intent by SKK management against Dr. Borzilleri, due to his ongoing resistance to signing an egregious separation agreement.


**Violation of Dr. Borzilleri's employment rights and breach of contract**


93. SKK unilaterally dismissed Dr. Borzilleri as a General Partner from investment fund,

without due process, as required by the fund's partnership documents.

94. Over the course of the last decade, SKK and the predecessor employer, GRT Capital, LLC have also breached both the express and implied contract terms pertaining to the GRT/SKK Health Care, LP investment fund.

95. For the past decade, the firm has kept approximately one-third of all management fee and performance-based compensation from the fund, despite providing minimal support to Dr. Borzilleri and his fund.

96. Most importantly, over the past 10 years, neither SKK or GRT provided Dr. Borzilleri and his fund any marketing efforts, which was inherent to the large fees kept by the firm.

97. Based upon this breached contract, SKK required Dr. Borzilleri to manage the funds of GRT/SKK partners for free.

98. The firm partners thereby made millions of dollars of investment gains and income off of Dr. Borzilleri's expertise, while failing to provide even basic contractual requirements.

99. Further "handcuffing" Dr. Borzilleri's livelihood, despite the lack of support, GRT/SKK maintained fund contract terms that required Dr. Borzilleri to provide a large portion of his ongoing fees to the firm, if he sought to bring his fund to another location at any time over the past decade.

100. These unfavorable separation terms also made it impossible for Dr. Borzilleri to negotiate reasonable economic terms with another potential partner after SKK's recent sudden notice of termination.

101. Despite his long history of benefit to the firm, SKK offered Dr. Borzilleri a meager severance compensation of $30,000 for his 15 years of dedicated employment.

102. SKK refused Dr. Borzilleri's good faith request to provide a fair severance package.

103. SKK simply wanted Dr. Borzilleri out of the firm as quickly as possible, at minimal cost,

due to his involvement in Qui Tam and SEC whistleblower actions.

104. SKK chose this path of action despite minimal due diligence and no substantive evidence of current harm or future risk to the firm from the Qui Tam actions.

105. SKK also pursued this path without providing any rationale to Dr. Borzilleri's for his termination prior to the lawsuit.

106. SKK aggressively pursued this goal via escalating deceit and intimidation, while exhibiting a complete disregard for the welfare of Dr. Borzilleri and his family.

## COUNT ONE
### False Claims Act
### 31 U.S.C. §§3729(a)(l) and (a)(2)

107. Plaintiff repeats and alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

108. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

109. This is a claim for penalties and damages for retaliation under the Federal False Claims Act.

## COUNT TWO
### False Claims Act
### 31 U.S.C. §3729(a)(3)

110. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

111. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the

reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

112. This is a claim for penalties and damages for retaliation under the Federal False Claims Act.

## COUNT THREE
### Federal False Claims Act
### 31 U.S.C. §3729(a)(7)

113. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

114. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

115. This is a claim for penalties and damages for retaliation under the Federal False Claims Act.

## COUNT FOUR
### Federal False Claims Act
### 31 U.S.C. §§3729(a)(l) and (a)(2)

116. Plaintiff repeats and alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

117. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

118. This is a claim for penalties and damages for retaliation under the Federal False Claims Act.

## COUNT FIVE
### California False Claims Act Cal Gov't. Code §12651(a)(7)

119. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

120. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

121. This is a claim for penalties and damages for retaliation under the California False Claims Act.

## COUNT SIX
### Colorado Medicaid False Claims Act
### Colo. Rev. Stat. §§ 25.5-4-303.5 through 25.5-4-310

122. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

123. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

124. This is a claim for penalties and damages for retaliation under the Colorado False Claims Act.

## COUNT SEVEN
### Connecticut False Claims Act
### Conn. Gen. Stat. § 17b-301b(a)(7)

125. Plaintiff repeats and realleges each and every allegation contained in the paragraphs

above as though fully set forth herein.

126. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

127. This is a claim for penalties and damages for retaliation under the Connecticut False Claims Act.

## COUNT EIGHT
### Delaware False Claims and Reporting Act
### 6 Del Code §1201(a)(7)

128. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

129. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

130. This is a claim for penalties and damages for retaliation under the Delaware Federal False Claims Act.

## COUNT NINE
### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(g)

131. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

132. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr.

Borzilleri.

133. This is a claim for penalties and damages for retaliation under Florida False Claims Act.

## COUNT TEN
### Georgia False Medicaid Claims Act
### Ga. Code Ann. §49-4-168.1(7)(Against All Defendants)

134. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

135. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

136. This is a claim for penalties and damages for retaliation under the Georgia False Claims Act.

## COUNT ELEVEN
### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)(7)

137. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

138. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

139. This is a claim for penalties and damages for retaliation under the Hawaii False Claims Act.

## COUNT TWELVE
### Illinois Whistleblower Reward and Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(7)

140. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

141. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

142. This is a claim for penalties and damages for retaliation under the Illinois False Claims Act.

## COUNT THIRTEEN
### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(6)

143. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

144. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

145. This is a claim for penalties and damages for retaliation under the Indiana False Claims Act.

## COUNT FOURTEEN
### Iowa False Claims Act
### Iowa Code §§ 685.1 through 685.7

146. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

147. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

148. This is a claim for penalties and damages for retaliation under the Iowa False Claims Act.

## COUNT FIFTEEN
### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat.§ 46:438.3(C)

149. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

150. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

151. This is a claim for penalties and damages for retaliation under the Louisiana False Claims Act.

## COUNT SIXTEEN
### Maryland False Health Claims Law
### Health-Gen. & 2-602 (a) (1), (2)

152. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

153. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

154. This is a claim for penalties and damages for retaliation under the Maryland False Claims Act.

## COUNT SEVENTEEN
### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(8)

155. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

156. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

157. This is a claim for penalties and damages for retaliation under the Massachusetts False Claims Act.

## COUNT EIGHTEEN
### Michigan Medicaid False Claims Act
### §400.607(3)

158. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

159. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

160. This is a claim for penalties and damages for retaliation under the Michigan False Claims Act.

## COUNT NINETEEN
### Minnesota False Claims Act
### Minn. Stat. §§ 15C.01 through 15C.16

161. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

162. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

163. This is a claim for penalties and damages for retaliation under the Minnesota False Claims Act.

## COUNT TWENTY
### Montana False Claims Act
### Mont. Code Ann. 17-8-403(1)(g)

164. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

165. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

166. This is a claim for penalties and damages for retaliation under the Montana False Claims Act.

## COUNT TWENTY-ONE
### Nevada Submission of False Claims to State or Local Government Act
### Nev. Rev. Stat. Ann. §357.040(1)(g)

167. Plaintiff repeats and realleges each and every allegation contained in the paragraphs

above as though fully set forth herein.

168. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

169. This is a claim for penalties and damages for retaliation under the Nevada False Claims Act.

## COUNT TWENTY-TWO
### New Hampshire False Claims ActN.H. Rev. Stat. Ann. §167:61-b(l)(e)

170. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

171. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

172. This is a claim for penalties and damages for retaliation under the New Hampshire False Claims Act.

## COUNT TWENTY-THREE
### New Jersey False Claims Act
### N.J. Stat. §2A:32C-3(g)

173. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

174. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

175. This is a claim for penalties and damages for retaliation under the New Jersey False Claims Act.

## COUNT TWENTY-FOUR
### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann.§ 27-14-3(a)(7)

176. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

177. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

178. This is a claim for penalties and damages for retaliation under the New Mexico False Claims Act.

## COUNT TWENTY-FIVE
### New York False Claims Act
### NY CLS St. Fin. §189(g)

179. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

180. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

181. This is a claim for penalties and damages for retaliation under the New York False Claims Act.

## COUNT TWENT-SIX
### North Carolina False Claims Act
### 2009-554 N.C. Sess. Laws §1-607(a)(7)

182. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

183. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

184. This is a claim for penalties and damages for retaliation under the North Carolina False Claims Act.

## COUNT TWENTY-SEVEN
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, §5053.1B (7)

185. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

186. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

187. This is a claim for penalties and damages for retaliation under the Oklahoma False Claims Act.

## COUNT TWENTY-EIGHT
### Rhode Island State False Claims Act
### R.I. Gen. Laws §9-1.1-3(7)

188. Plaintiff repeats and realleges each and every allegation contained in the paragraphs

above as though fully set forth herein.

189. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

190. This is a claim for penalties and damages for retaliation under the Rhode Island False Claims Act.

### COUNT TWENTY-NINE
**Tennessee False Claims Act and Medicaid False Claims Act**
**Tenn. Code Ann. §§ 4-18-103(a)(7) and 71-5-181(a)(l)(D)**

191. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

192. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

193. This is a claim for penalties and damages for retaliation under the Tennessee False Claims Act.

### COUNT THIRTY
**Texas Medicaid Fraud Prevention Act**
**Tex. Hum. Res. Code Ann. §36.002(12)**

194. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

195. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr.

Borzilleri.

196. This is a claim for penalties and damages for retaliation under the Texas False Claims Act.

## COUNT THIRTY-ONE
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(7)

197. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

198. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

199. This is a claim for penalties and damages for retaliation under the Virginia False Claims Act.

## COUNT THIRTY-TWO
### Washington Medicaid Fraud False Claims Act
### Wash. Sess. Laws, Laws of 2012
### Ch. 241 §§ 201 through 214

200. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

201. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

202. This is a claim for penalties and damages for retaliation under the Washington False Claims Act.

## COUNT THIRTY-THREE
### Wisconsin False Claims For Medical Assistance Act
### Wis. Stat. §20.931(2)(g)
### (Against All Defendants)

203. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

204. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

205. This is a claim for penalties and damages for retaliation under the Wisconsin False Claims Act.

## COUNT THIRTY-FOUR
### District of Columbia False Claims Act D.C.
### Code Ann. §2-308.14(a)(7)

206. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

207. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

208. This is a claim for penalties and damages for retaliation under the District of Columbia False Claims Act.

## COUNT THIRTY-FIVE
### Whistleblower Retaliation
### Dodd-Frank Act, 15 U.S.C. § 78u-6(h) *et seq.*

209. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

210. As a result of Dr. Borzilleri's lawful acts in furtherance of protected activities in the reporting of fraud, and the Defendant's knowledge thereof, Defendant retaliated against Dr. Borzilleri.

211. This is a claim for penalties and damages for retaliation under the Dodd-Frank Act.

## COUNT THIRTY-FIVE
### Wrongful Termination

212. Dr. Borzilleri repeats and incorporates by reference each of the above allegations as if fully set forth herein.

213. Dr. Borzilleri was terminated by being served a frivolous lawsuit, with unsubstantiated allegations.

214. Dr. Borzilleri was also terminated with violations of the terms of the General Partnership agreement governing his healthcare investment fund.

## COUNT THIRTY-SIX
### Breach of SEC Fiduciary Duty
### Investment Advisor Act of 1940

215. Dr. Borzilleri repeats and incorporates by reference each of the above allegations as if fully set forth herein.

216. SKK breached its duty as an SEC-registered investment advisor by not communicating promptly to clients about changes in Dr. Borzilleri's status, including trading restrictions place on him as the fund manager and his termination.

217. SKK further breached its SEC fiduciary responsibilities by not communicating all viable options to fund investors once the firm decided to terminate its relationship with Dr. Borzilleri, including allowing the fund to go to another location, transfer of assets in-kind and/or liquidation.

218. SKK breached its SEC fiduciary duty, while causing severe and unnecessary harm to Dr. Borzilleri, and other fund investors, when it forcibly liquidating the fund.

219. SKK's unilateral action led to unwarranted investment losses and a severe tax liability for all investors.

220. SKK further breached its SEC fiduciary duty by failing to inform investors, prior to fund liquidation, of the severe tax consequences of the action.

## COUNT THIRTY-SEVEN
### Breach of Contract

221. Dr. Borzilleri repeats and incorporates by reference each of the above allegations as if fully set forth herein.

222. SKK breached the terms of Dr. Borzilleri's partnership agreement governing his investment fund, SKK/GRT Health Care, LP.

223. SKK dismissed Dr. Borzilleri as a General Partner from the fund, without due process or proper written notice of the "cause" of termination.

224. Over the past decade, SKK has violated both the express and implied terms of the fund contract, by keeping egregious amounts of management and performance fees and not performing contractually-required duties.

225. Despite not performing contractually-required duties, GRT/SKK maintained onerous economic separation terms with Dr. Borzilleri, thereby "handcuffing" him to the firm and severely-harming his livelihood.

## COUNT THIRTY-EIGHT
### Unjust Enrichment

226. Dr. Borzilleri repeats and incorporates by reference each of the above allegations as if fully set forth herein.

227. While failing to meet basic contractual obligations over the past decade, SKK/GRT partners continued to extract egregious management and performance fee income from Dr. Borzilleri's investment fund.

228. As a result of these unmet contract expectations, Dr. Borzilleri was forced to manage the assets of GRT/SKK partners for free, without recourse. These partners made millions of dollars of unwarranted investment returns from Dr. Borzilleri's expertise.

## COUNT THIRTY-NINE
### Breach of Good Faith and Fair Dealing

229. Dr. Borzilleri repeats and incorporates by reference each of the above allegations as if fully set forth herein.

230. SKK has breached its covenant of good faith and fair dealing by *inter alia*,

    a. Refusing to provide any substantive information in writing to Dr. Borzilleri and potential partners, thereby preventing him from pursuing his livelihood in another location;

    b. Forcing Dr. Borzilleri out of the firm in only weeks, without assisting him, in any way, in the pursuit of his livelihood in another location;

c.  Failing to honor the terms of his fund and employment contracts;

d.  Failing to provide contractually-required services to Dr. Borzilleri and his investment fund;

e.  Failing to offer Dr. Borzilleri any kind of fair separation agreement offer, commensurate with his long employment and strong contribution to the firm and its partners;

f.  By retaliating unnecessarily against Dr. Borzilleri, and other SKK clients, by forcibly liquidating Dr. Borzilleri's investment fund, against their will; thereby leading to severe financial harm.

231. As a direct and proximate result of SKK's breach of implied covenant of good faith and fair dealing, Dr. Borzilleri has suffered and will continue to suffer damages, including having to defend himself against false and public allegations. Dr. Borzilleri has also suffered and will continue to suffer severe financial harm from SKK's actions.

232. Upon information and belief, SKK acted willfully and maliciously.

## COUNT FORTY
### Breach of Loyalty

233. Dr. Borzilleri repeats and incorporates by reference each of the above allegations as if fully set forth herein.

234. SKK owed a common law duty of loyalty to Dr. Borzilleri as an employee.

235. SKK breached its duty by terminating Dr. Borzilleri, without cause, leading to severe and irreparable harm to his livelihood and reputation.

236. SKK also breached its duty by subversively and adamantly refusing to communicate with Dr. Borzilleri in an open, transparent and professional manner.

237. SKK also breached its duty through its wonton disregard for the welfare of a long-term, high performing employee and his family.

238. Dr. Borzilleri has been severely damaged as a result.

239. Dr. Borzilleri is entitled to missed compensation and damages, past, present and future, resulting from SKK's behavior that breached its duty of loyalty to him as an employee.

240. Upon information and belief, SKK acted willfully and maliciously.

### COUNT FORTY-ONE
#### Defamation

241. Dr. Borzilleri repeats and incorporates by reference each of the above allegations as if fully set forth herein.

242. SKK has publicly and falsely accused Dr. Borzilleri of wrongdoing, including allegations of violations of his "Employment Agreement" and "SKK policies and procedures" and "trading activities".

243. SKK has also falsely accused Dr. Borzilleri of seeking to induce other SKK staff to leave their employment with the firm. SKK statements regarding this matter falsely misrepresented Dr. Borzilleri's email communications with other colleagues.

244. SKK's actions, publicly misrepresenting the nature of Dr. Borzilleri's activities and falsely accusing him of misconduct, have caused Dr. Borzilleri severe financial and reputational harm.

### PRAYER FOR RELIEF

WHEREFORE, Dr. Borzilleri respectfully requests entry of judgment in his favor and against SKK as follows:

A. Entering judgment in favor of Dr. Borzilleri;

B. Awarding Dr. Borzilleri damages resulting from SKK's
   violation of whistleblower statutes, breach of fiduciary duty, breach of
   contract, unjust enrichment, failure to act in good faith, breach of loyalty,
   defamation, other relevant statutes and common law;

C. A declaration that SKK acted unlawfully in suspending Dr. Borzilleri's trading
   activities on behalf of SKK Healthcare Fund, LP, terminating Dr. Borzilleri's
   employment, and ending certain other ancillary relationships between SKK,
   Dr. Borzilleri and the SKK Healthcare Fund.

D. A declaration that SKK retaliated against Dr. Borzilleri for protected activity.

E. A declaration that SKK was not excused from performing its obligations under
   the Employment and Association Agreement, because Dr. Borzilleri did not
   commit material breaches thereof.

F. An order enjoining and restraining SKK from making any statement to any third
   party claiming that SKK did not retaliate against Dr. Borzilleri for protected
   activity, or otherwise acted lawfully in suspending Dr. Borzilleri's trading
   authorization on behalf of SKK Health Care Fund, LP, terminating Dr.
   Borzilleri's employment, and ending certain ancillary relationships between
   SKK, Dr. Borzilleri, and the Fund.

G. An amount of damages to be determined at trial.

H. A judgement re-instating any unpaid compensation to Dr. Borzilleri during any
   period in which SKK engaged in actions violating its duty of loyalty to Dr.
   Borzilleri.

I. An award of costs incurred in this action.

J. An award of prejudgment interest at prevailing statutory rate.

K. Such other and further relief as this Court deems just and proper.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury.

Dated:  May 25, 2018

Respectfully submitted,

John R. Borzilleri, MD (Pro Se)
1815 Haywaters Road
Cutchogue, NY  11935
(617) 276-7141
borzillerij@gmail.com


## CERTIFICATE OF SERVICE

I, John R. Borzilleri, MD, hereby certifies that a copy of the foregoing

document has been served by mail this 25th day of May 2018 upon the following counsel

of record:

Christopher D. Browne, Esq.
B B O #  6 7 0 5 5 1
Shepherd Kaplan Krochuk, LLC
125 Summer Street, 22nd Floor
Boston, MA  02110
(617) 896-1689
cbrowne@skk-llc.com

# Exhibit 1

## SEPARATION AND RELEASE AGREEMENT

This Separation and Release Agreement ("Agreement") is made by and between Shepherd Kaplan Krochuk LLC, a Delaware limited liability company (the "Company" or "Employer"), and John Borzilleri (the "Portfolio Manager" or "Manager"). The Company and Manager are sometimes collectively referred to as the "Parties."

WHEREAS, the Manager has been employed by the Company and in connection therewith has executed an Association and Employment Agreement dated May 16, 2011 ("Prior Agreement"), under which the Manager provided services related to the management of SKK Health Care, LP (the "Fund");

WHEREAS, the Manager was formerly a member of GRT Health Care GP, L.L.C. (the "GP"), and is currently a member of SKK Group, LLC (the "Group GP"); and

WHEREAS the express purpose of this Agreement is to provide for the separation of Manager and Company and end their employment relationship and certain other relationships;

NOW THEREFORE, in consideration of the mutual promises made herein, the Company and Manager hereby agree as follows:

1. **Effective Date.** This Agreement is effective on May 9, 2018 (the "Separation Date").

2. **Manager Relationship Termination.** Further to prior notice provided to Manager on or about April 20, 2018, Manager's employment and other relationships to the Company, including the Prior Agreement, are terminated effective as of the Separation Date.

3. **Affiliate Separation.** In accordance with the Manager's termination, Manager will cease to be a member of Group GP as of the Separation Date. Manager acknowledges that he ceased to be a member of the GP as of November 1, 2017. The transfer, administration and/or liquidation of the Fund will be implemented in an orderly fashion designed to protect the best interests of investors.

4. **Consideration.**

(a) **Severance Compensation.** The Company shall deliver, or cause to be delivered, to Manager such other salary, vacation, and other wages due and payable as of the Separation Date ("Base Compensation"). In addition, the Company shall pay to Manager (i) in a timely manner consistent with the appropriate administration of the Fund, all accrued but unpaid management fees payable by the Fund as of the Separation Date, without withholding any amounts due to the Company under the Prior Agreement; (ii) in a timely manner consistent with the appropriate administration of the Fund, the full performance allocation allocated to the GP and the Group GP as of the first to occur of the liquidation of the Fund or December 31, 2018, without withholding any amounts due to the Company under the Prior Agreement or the operating agreement of the Group GP; and (iii) a sum of $30,000 (all such compensation together, "Severance Compensation").

(b) **Benefits.** Manager will not accrue any benefits after the Separation Date. Manager will be entitled to apply for unemployment benefits as of May 9, 2018 if he has not yet found new employment. From the Separation Date through December 31, 2018, the Company shall pay or reimburse the cost of the Manager's continued health and dental coverage on the terms and conditions prescribed by COBRA. All other benefits shall terminate on the Separation Date, including without limitation Company 401(k) contributions, and life and disability insurance.

(c) **Complete Settlement**.  Manager acknowledges and agrees that the consideration contained in Sections 3(a) and (b) represents full and complete consideration for Manager's release of claims pursuant to Section 5 hereof and the other agreements of Manager referred to herein.  Manager agrees that he will not seek any further compensation whatsoever from the Company or its affiliates, including the Group GP, the GP, or the Fund, for any other claim, damage, cost, or attorneys' fees.  Manager acknowledges and agrees that he has not, shall not, and is not entitled to, make an Election to Transfer as that term is defined under the Prior Agreement or claim any rights under Annex B of the Prior Agreement.

(d) **Non-acceptance of this Agreement**.  If Manager chooses not to accept this Agreement on or before May 14, 2018, the Company will nevertheless pay Base Compensation, and Manager's employment will nevertheless terminate on the Separation Date.  In such event, the Company will **not** make available the Severance Compensation described in Section 3(a), and will **not** continue to cover the cost of health and dental coverage for Manager after May 30, 2018, but Manager may have COBRA rights after such date.

4.      **Payment of Salary and Benefits**.  Manager acknowledges and represents that subject to the payments due under Section 3(a) above, the Company has provided and paid all salary, bonuses, wages, accrued vacation, commissions and any and all other rights, privileges and benefits due to Manager.

5.      **Release of Claims**.  Manager, on behalf of himself, and his respective heirs, family members, executors,  and assigns, hereby fully and forever releases the Company, the Group GP, the GP, and their officers, directors, members, managers, Managers, affiliates, employees, agents, predecessor and successor entities and assigns, from any claim, duty, contract, obligation or cause of action relating to any matters of any kind, at law or in equity, whether presently known or unknown, suspected or unsuspected, since the beginning of time, which now exists or that may arise in the future, that he may possess arising from any omissions, acts or facts that have occurred up until and including the Separation Date including, without limitation:

- any and all claims relating to or arising from Manager's employment relationship with the Company, including without limitation claims under the Prior Agreement, and the termination of that relationship

- any and all claims against, relating to, or arising from his membership interest in the Group GP or the GP, or his limited partnership interest in the Fund;

- any and all claims for wrongful discharge of employment; breach of contract, both express and implied; breach of a covenant of good faith and fair dealing, both express and implied; negligent or intentional infliction of emotional distress; negligent or intentional misrepresentation; negligent or intentional interference with contract or prospective economic advantage; defamation; negligence; personal injury; assault; battery; invasion of privacy; false imprisonment; and conversion;

- any and all claims for violation of any federal, state or municipal statute, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, the False Claims Act, the Americans with Disabilities Act of 1990, the Family and Medical Leave Act, the Fair Labor Standards Act, and The Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B (2015);

- any and all claims arising out of any other laws and regulations relating to employment or employment discrimination; and

- any and all claims for attorneys' fees and costs.

The Manager agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released.  This release does not extend to any obligations incurred under this Agreement.

6.   **Acknowledgment of Waiver of Claims.**   Manager acknowledges that he is waiving and releasing any rights he may have against the Company.  Manager acknowledges that the consideration given for this waiver and release is in addition to anything of value to which he was already entitled. Manager further acknowledges that he has been advised by this writing and understands and agrees that:

- he is advised to consult with an attorney prior to executing this Agreement;

- he has carefully read and fully understands this Agreement;

- he is, through this Agreement, releasing the Company, from any and all claims he may have against it;

- he knowingly and voluntarily agrees to all of the terms set forth in this Agreement; and

- he knowingly and voluntarily intends to be legally bound by the provisions of this Agreement.

- Manager acknowledges that any actions taken by the Company with respect to his employment are solely for lawful reasons, if any, and that he has not suffered any workplace injury.

7.   **Confidential Information**.  To the maximum extent permitted by applicable law, Manager agrees to continue to maintain the confidentiality of all confidential and proprietary information of the Company and shall continue to comply with the terms and conditions of the Prior Agreement regarding Confidential Information, Systems Access, Company Property, Non-Solicitation, and Inventions.  Without limitation of the foregoing, Manager agrees to return all of the Company property and confidential and proprietary information in Manager's possession to the Company within five days after the Separation Date or the Effective Date of this Agreement, whichever is later.  To the maximum extent permitted by law, Manager and the Company shall not disclose the terms and substance of this Agreement, to any person or entity other than their counsel, any forum adjudicating a dispute arising from the Agreement, or any governmental or regulatory entity compelling such disclosure in an exercise of valid jurisdiction.

8.   **Mutual Non-Disparagement.**  To the maximum extent permitted by applicable law, the Company agrees to instruct key personnel to refrain from any lawful or unlawful disparagement, defamation, slander, or libel of the Manager, or tortious or non-tortious material interference with the contracts, relationships, and prospective economic opportunities and advantageous relationships of the Manager.

To the maximum extent permitted by applicable law, the Manager agrees to refrain from any lawful or unlawful disparagement, defamation, slander, or libel of the Company, the GP, the Group GP, and their respective members, managers, officers, agents, employees, or affiliates, or tortious or non-tortious material interference with the contracts, relationships, and prospective economic opportunities and advantageous relationships of those parties, including, with respect to the Company, private funds sponsored and advised by it.  Any violation of this Section 8 shall constitute a material breach of this Agreement.

9.   **Arbitration.**  The Parties agree that any dispute or controversy in any way arising out of, relating to, or in connection with this Agreement (except to the extent provided in Section 7 thereof), including without limitation the scope and enforceability of this Section 9, whether the Parties have agreed to arbitrate a particular dispute, or the interpretation, validity, construction, performance, breach, or termination hereof, or any of the matters herein released, shall be settled by binding arbitration to be held in Boston, Massachusetts in accordance with the Streamlined Arbitration Rules of JAMS. (the "Rules"). Provided, however, that to the maximum extent permitted by law, the arbitrator or arbitrators shall be without authority to award punitive or exemplary damages and neither Company nor Manager shall be permitted to pursue class or collective claims in arbitration. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration.  Judgment may be entered on the arbitrator's

decision in the Superior Court for Suffolk County, Massachusetts, to which jurisdiction all Parties irrevocably consent.

The arbitrator(s) shall apply Massachusetts law to the merits of any dispute or claim, without reference to conflicts of law rules, except to the extent Massachusetts law is preempted by federal law, in which case the arbitrator(s) shall apply federal law only to the extent of such preemption. The arbitration proceedings shall be governed by federal arbitration law and by the Rules, without reference to state arbitration law.

Notwithstanding anything to the contrary in this Agreement, either the Company or the Manager can seek equitable relief in the Business Litigation Session of the Massachusetts Superior Court to restrain breach or threatened breach of Section 9 hereof or of the Proprietary Agreement, or other disclosure or threatened disclosure of Confidential Information or trade secrets.

**MANAGER HAS READ AND UNDERSTANDS THIS SECTION 9, WHICH DISCUSSES ARBITRATION. MANAGER UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, MANAGER AGREES TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION HEREOF, OR ANY OF THE MATTERS HEREIN RELEASED, TO BINDING ARBITRATION, AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF MANAGER'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO THIS AGREEMENT.**

10.     **Costs.** The prevailing party in any action, proceeding, or arbitration arising from this Agreement shall be entitled to recover its costs and reasonable attorney's fees from the non-prevailing party in such action, proceeding, or arbitration. If there is no prevailing party, each party shall bear its own costs and attorney's fees. The arbitration shall have sole discretion to determine the prevailing party on a claim-by-claim basis and to determine the amount of costs and reasonable attorney's fees awarded.

11.     **Authority**. The Company represents and warrants that the undersigned has the authority to act on behalf of the Company and to bind the Company and all who may claim through it to the terms and conditions of this Agreement. Manager represents and warrants that he has the capacity to act on his own behalf and on behalf of all who might claim through him to bind them to the terms and conditions of this Agreement. Each Party warrants and represents that there are no liens or claims of lien or assignments in law or equity or otherwise of or against any of the claims or causes of action released herein

12.     **No Representations**. Each Party represents that the Party has carefully read and understands the scope and effect of the provisions of this Agreement. The Parties agree that they do not rely and have not relied upon any representations or statements made by any other party hereto which are not specifically set forth in this Agreement.

13.     **Severability and Reformation; Conformity with Applicable Law**. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, such provision shall be reformed to be legal, enforceable, and valid on such terms as most closely the original provision concerned. If such reformation is not possible, the provision concerned shall be stricken and of no further force or effect. Whether or not any provision hereof is reformed or stricken, the remainder of this Agreement shall continue in full force and effect without said provision.

Notwithstanding anything in this Agreement to the contrary, no term or obligation imposed by this Agreement shall operate as an unlawful restraint on disclosure of information.

14.     **Entire Agreement**. Other than the Proprietary Agreement which remains in effect without modification, this Agreement represents the entire agreement and understanding of the Parties concerning Manager's relationship with the Company and supersedes and replaces any and all prior agreements and understandings, whether written or oral, concerning Manager's relationship with the Company and his compensation by the Company through the Separation Date.

15.     **No Oral Modification**.  Any modification or purported modification of this Agreement, unless in writing and signed by all Parties, shall be both void and a material breach thereof.

16.     **Governing Law**.  This Agreement shall be governed by the internal substance laws, but not the choice of laws rules, of the Commonwealth of Massachusetts.  Insofar as Massachusetts law may be preempted by federal law in application to this Agreement, federal law shall govern only to the extent of such preemption.

17.     **Counterparts; Further Documents**.  This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.  The Company and Manager agree, without receiving any further consideration, to sign and deliver any documents and take any other action as may be necessary in the future to effectuate the provisions of this Agreement.

18.     **Voluntary Execution of Agreement**.  This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of any Parties hereto, with the full intent by the Manager of releasing all claims.  The Parties acknowledge that:

- they have read this Agreement;
- they have had the opportunity to consult legal counsel of their own choice;
- they understand the terms and consequences of this Agreement and of the releases it contains; and
- they are fully aware of the legal and binding effect of this Agreement.

19.     **Construction**.  Each Party to this Agreement has been provided with sufficient opportunity to review its terms with the benefit of counsel.  Consequently, ambiguities in this Agreement, if any, shall not be construed against the drafter.

IN WITNESS WHEREOF, the Company and Manager voluntarily agree to and have executed this Agreement on the respective dates set forth below.


Dated: _____, 2018        _____
                                     John Borzilleri


                                     SHEPHERD KAPLAN KROCHUK LLC

Dated: _____, 2015        By:_____
                                     Its Managing Member

## Exhibit 2

**John Borzilleri <borzillerij@gmail.com>** May 17

to Christopher, Tim, John, Darman, Paul, bcc: me

To All:

Below is the text of the complaint I filed electronically with the SEC today. I will also be mailing it today to ensure proper delivery.

Sincerely,

John R. Borzilleri, MD

_____

Dear SEC:

I am writing to inform the SEC of what I believe to be severe violations of fiduciary duty to clients by my former employer, Shepherd Kaplan Krochuk, a registered investment advisor with the SEC.

In an ongoing effort to retaliate and intimidate against me personally, the firm has repeatedly neglected to report material information to the investors in my investment fund. In recent days, the firm has unilaterally decided to liquidate the fund, exposing myself (as one of the largest investors) and all investors unnecessarily to large tax liabilities, trading costs and likely unnecessary losses on securities in the fund. The firm has communicated none of this material information to investors, despite my repeated written requests that they do so. The firm has also not disclosed that its harmful course of action is not required by the clear terms in the fund's documents. They are not providing any options to investors, including myself, other than liquidation. To give the extent of the harm, myself and my family will be subject to an approximate $300,000 tax bill in 2018 that could easily be avoid by ethical and proper fiduciary behavior by the firm.

Background and Recent Events

I was the 15-year successful portfolio manager of a healthcare long/short fund at Shepherd Kaplan Krochuk and its predecessor firm. I was always in excellent standing at the firm until I

was terminated illegitimately, (in violation of the terms of my fund operating contract) on May 9th, 2018 by being served a lawsuit claiming violations of undisclosed company policies. In the coming weeks, I will be filing an Answer with Counterclaims pertaining to this frivolous lawsuit in Massachusetts Superior Court.

In reality, in my view, the firm has aggressively sought to terminate my employment, starting only days after they became aware of public disclosure of two Qui Tam cases I filed several years ago, as well as a more recent SEC Whistleblower cases pertaining to the same Qui Tam defendants. These cases pertain to my 5-year ongoing investigation of severe US drug price increases. However, these potential Whistleblower issues are secondary to the fiduciary concerns in this filing.

Only an hour after being served the lawsuit on May 9, 2018, the firm emailed me a proposed Separation and Release Agreement, seeking to intimidate and coerce me into absolving them of any potential liability for potential whistleblower retaliation claims, on terms very unfavorable to myself and my family. In the email, the firm indicated that they would discontinue the lawsuit if I signed the document.

I notified the firm that I would not sign the agreement (on such unfavorable terms) on the afternoon of May 14, 2018. Just a few hours later, the firm apparently notified investors in my fund (but not myself, even though I am the largest investor in the fund) that I had been terminated by the firm (without any reason stated) and that the fund would be quickly liquidated in about 30 days. The firm indicated that there would not be any further communication with investors, other than to obtain wiring instructions for the proceeds when the liquidation was complete. Of note, on May 9th, I had also informed the firm via email that I believed we had a fiduciary duty on that day to promptly inform investors of my termination. The firm ignored that request, indicating that communication with investors could be discussed with my attorney once I signed the settlement agreement. Investors were not informed of my termination until 5 days after it occurred.

Over the next several days following the 14th, I exchanged a series of emails with the senior management and legal staff of the firm, once again informing them of the severe capital gains and tax consequences for investors from a forced liquidation of the fund. I can provide all the communications to the SEC. I informed them that investors would be exposed to approximately $3,000 of largely short-term capital gains for each $10,000 of invested capital. I also informed them that they had a fiduciary duty to inform investors of the material financial impact of their liquidation plan. They ignored this request. I also reminded them that the operating documents for my fund allowed the firm to transfer the equity positions from the fund in-kind, rather than via cash, to any or all investors. I also repeatedly stated that I wanted to receive the equity positions in-kind so that I could avoid a massive tax bill and maintain my investments. They informed me that they would not do it, against my clearly stated wishes,

without providing any rationale. I consider this a severe violation of my rights as the largest investment partner in the fund.

The firm also removed me from the General Partner of the fund, supposedly based upon unclear violations of my employment agreement (a copy of which they will not supply to me), but without the contractually-required 10-day written notice. As such, I was illegitimately discharged from the fund and should legally still considered a member.

As a member of the GP, the documents clearly state that I should have the option to continue my investment fund. Furthermore, several of the existing clients have called me and expressed interest in continuing their investment with me and are actively seeking to avoid the severe tax consequences of forced liquidation. Most of the clients have been investors in my fund for more than a decade. Furthermore, I have identified several potential new partners that were willing to quickly and seamlessly transfer of my fund to a new location, obviously at a lower cost compared to forced liquidation. Of note, in repeated conversations prior to my termination, the senior partner, Tim Krochuk indicated his willingness to transfer assets in-kind and that is was very easy to do so. However, now apparently in retaliation against me personally, the firm will no longer consider this option, leading to unnecessary severe financial harm to all investors in the fund.

The senior staff at SKK with which I have repeatedly communicated regarding this matter include Tim Krochuk (Partner), Dave Shepherd (Partner), Sebastian Granzo (Counsel) Christopher Brown (Counsel), Darman Wing (Counsel), and Paul Gehrke.

In closing, I hope the SEC will address these clear fiduciary violations in a prompt manner. Although I don't have direct knowledge anymore, the firm has indicated that it has already commenced the liquidation process, leading to severe harm to myself and other long-term investors in my fund. While the firm apparently has little regard for the financial well-being of the investors in my fund, my concern remains acute regardless of whether I have control of the fund.

Of note, I also view this complaint filing with the SEC (by the long term and only investment manager of the fund) as material information that should be promptly disclosed by Shepherd Kaplan Krochuk to the at risk investors in my healthcare fund. I will provide the contents of this SEC complaint to Shepherd Kaplan Krochuk right after filing with the SEC.

I can be reached at (617) 276-7141.


Sincerely,


John R. Borzilleri, MD